STATE

v.

**Jeffrey Scott HORNOFF.**

No. 99–508–C.A.

Supreme Court of Rhode Island.

Oct. 24, 2000.

Aaron Weisman, Annie Goldberg, Assistant Attorneys General, for Plaintiff.

Susan B. Iannitelli, for Defendant.

Present: WEISBERGER, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

GOLDBERG, Justice.

On the morning of August 11, 1989, Victoria Cushman (Victoria) failed to appear for her scheduled shift at the Alpine Ski & Sports store on Maple Street in Warwick, Rhode Island. A friend and coworker, concerned about her unexplained absence, enlisted the aid of two fellow coworkers, and all three walked to her apartment, adjacent to the Alpine store in search of their friend. Instead of finding the smiling young woman whom they had all come to know, they found Victoria lying in a pool of blood on the living room floor, obviously dead from severe head trauma. She had been brutally beaten with a heavy fire extinguisher that lay on the floor next to her body. Doctor William Q. Sturner (Dr. Sturner), who at the time of the murder was the chief medical examiner for the State of Rhode Island, later testified that the victim had suffered numerous fractures to her skull as a result of repeated blows with the seventeen-pound fire extinguisher. The autopsy also revealed evidence of asphyxiation, an initial disabling injury, that in Dr. Sturner's opinion, rendered Victoria unconscious before she was beaten to death. Doctor Sturner testified that Victoria died as a result of cranial cerebral trauma resulting in three distinct sets of fractures to the vault of the skull. Doctor Henry Lee, a noted criminologist, testified that the low level at which blood had been splattered around the body established that the final deadly blows were inflicted after Victoria had been strangled and rendered unconscious on the floor.

Almost six years later, after separate investigations by the Warwick Police Department and the Rhode Island State Police, the defendant Jeffrey "Scott" Hornoff (Hornoff or defendant), was found guilty of the murder of Victoria Cushman following a jury trial in the Providence County Superior Court.[1] He was thereafter sentenced to a mandatory term of life imprisonment. The defendant has appealed.

### Facts and Travel

Kerri Martin (Kerri), the friend who first arrived at Victoria's apartment on the morning of the murder, testified that she initially encountered Victoria's cat and was immediately clawed by the traumatized animal. Sensing that something was amiss, Kerri sought the assistance of two other fellow employees, Deborah Laffey and Gary Anderson (Gary). When Gary finally entered the apartment, he discovered the lifeless body of twenty-nine-year old Victoria Cushman, a graduate of the University of Maryland and former United States Army Intelligence Officer. The police were summoned to the scene.

The decedent was found behind a chair on the living room floor, clothed in a pink bathrobe; her head lay in a pool of blood. A fire extinguisher, a pair of yellow dishwashing gloves that were apparently hastily removed with the inside of the gloves turned out, and an open handbag containing Victoria's wallet with cash and credit cards were found adjacent to the body. Although there was no indication of forced entry into the apartment, the crime scene consisted of an open window with a screen leaning against the wall just to the right of the victim's feet. According to the first officer on the scene, nothing in the apartment appeared to have been disturbed except the fire extinguisher and an overturned plant. A piece of rotted wood from the building was discovered in the garden outside the open window, and the flowers below the window had been trampled. The officers also discovered muddied scuff marks adjacent to a pipe on the outside of the building. These factors led the investigators to conclude that the open window, trampled flowers and scuff marks on the building were an attempt by the defendant to stage a break-in, thereby suggesting

1. The trial justice entered an order, granting defendant's motion for a change of venue, on April 26, 1996, transferring the case from Kent County to Providence County, where it was heard and decided.

that an unknown intruder had gained entrance to Victoria's apartment and killed her.

The defendant, a detective with the Warwick Police Department, a member of its Dive Team, and a frequent Alpine patron, came under suspicion almost immediately after the discovery of the body. He was not indicted, however, until 1994, some five years after the murder and only after the Rhode Island State Police took over the investigation from the Warwick Police Department. Hornoff's extramarital affair with the victim led the investigators to suspect that he was the perpetrator. An envelope addressed to "Scott Hornoff" containing a letter written by the victim to Hornoff was found at the crime scene. The letter disclosed the relationship between the decedent and Hornoff and indicated that despite defendant's efforts to terminate their relationship, Victoria did not want the affair to end.[2] The letter's accuracy was confirmed, and defendant's involvement in an extramarital affair with the victim was established in the early stages of the investigation. At the time of the murder, Hornoff was married to Rhonda Hornoff and was the father of an infant son. Although accounts of his relationship with the victim ranged from a few brief and isolated sexual encounters, to a continuous and somewhat serious affair, it was clear that during the period immediately preceding the murder, the defendant and the victim were involved in an extramarital affair and that defendant had attempted to terminate their relationship.

The evidence disclosed that four or five weeks before the murder, Victoria began to confide in a fellow Alpine employee, Joanne Archetto (Ms. Archetto), that she was dating a Warwick police officer who was married but planning to end his marriage so they could embark upon a more permanent relationship. By August 9, 1989 however, Victoria's hopes had deteriorated. She arrived at work that day visibly upset, and explained to Ms. Archetto that the police officer had ended their relationship ostensibly to spend more time with his family. Victoria was described as surprised and angry at this sudden turn of events.

On the night of August 10, 1989, a party was held at the home of Warwick Police Officer Raymond Galluci and his wife, Deborah. Hornoff attended the party with his wife and their young son. Shortly after 10 p.m., Rhonda Hornoff and the baby left the party. An argument developed when Hornoff refused to accompany them home and opted to remain at the party, informing his wife that he would get a ride home with someone else. The evidence disclosed that the defendant consumed a significant amount of alcohol that evening, including beer and punch spiked with hard liquor. It is also clear that defendant was in a rather jovial mood; he had been drinking socially, and continued to interact with the other guests. He and his brother, John "David" Hornoff (David), also a detective with the Warwick Police Department, left the party between 10:30 and 11 p.m. Hornoff and his brother gave different accounts about whether or not defendant actually entered his house. What is clear, however, is that Hornoff returned to the Gallucci party in the early morning hours of August 11, 1989. At this point, defendant was in a very different state of mind. He was no longer a social and talkative partygoer, but rather, by all accounts, he looked pale, dazed, sick, with a blank, staring look on his face.

David Hornoff, having learned of the murder on the midday newscast and aware

**2.** The letter written by the victim to the defendant made the relationship between the two clear. "I know how hard this situation must have been for you—as you said—a major dilemma. I wanted to be the kind of person who was strong enough to say—'your best interests come first, I'll let you go easily.' But I couldn't and I can't \* \* \*. If I wait for you to try and work things out I fear I will lose you—you are saying now that I can't lose you because I never had you, but you're wrong—we had a lot over these past few weeks. Something special happened, that I can't easily deny or ignore."

of defendant's relationship with the victim, immediately called his brother with the gruesome news. However, when Hornoff arrived at the police station for his afternoon shift, he feigned ignorance and inquired about the identity of the victim. When informed by a group of detectives that the victim was Victoria Cushman, defendant appeared to be shocked and volunteered that he had been closely acquainted with the decedent. He then picked up the phone, dialed a number and stated that it was Victoria Cushman who had been killed. Later, when the Warwick detectives mentioned the name Victoria Cushman to the defendant, he immediately responded that the name did not ring a bell. While defendant was being questioned at the station, other detectives went to defendant's home to speak with his wife about the events of the previous evening. Rhonda said that she arrived home with the baby between 11 and 11:30 p.m., and that she heard her husband come home at approximately midnight. With the exception of a brief exit to tend to the family dogs, Rhonda maintained, her husband was in bed sleeping beside her for the entire night. After the detectives left, however, Rhonda called Steve Branch, another Warwick police officer and a close friend of the defendant's, and inquired about her husband's travels the previous evening.

When questioned further about his whereabouts that fateful night, defendant gave a version different from that of his wife. He initially stated that his brother had taken him home from the Gallucci party at about 11 p.m., after his wife and son had departed. He said that he did not go into the house right away because he decided to return to the Gallucci party in his own car to retrieve some cassette tapes that he had left at the party. Later, in yet another version, defendant told the State Police that he had no recollection of what happened that evening and that he would therefore rely upon his wife's memory. David Hornoff also told a different story. It was his contention that after dropping his brother off at home, he actually saw the defendant enter the house.

Confronted with these wholly incongruous and self-serving statements, as well as the other circumstantial evidence presented at trial, a jury convicted Jeffrey Scott Hornoff of murder in the first degree. On appeal, the defendant has raised numerous issues, some that we deem to be repetitious and others that were not adequately preserved for appellate review.

### Murder in the First Degree

The defendant has launched a two-pronged challenge to his conviction of first-degree murder. Hornoff contends that the state failed to meet its burden of proof in trying to establish that he was the perpetrator and, that the trial justice erred in failing to grant a judgment of acquittal on first-degree murder, thus reducing the charge to second-degree murder. Both arguments rest largely on the ground that the state's proof was limited to circumstantial evidence that created inferences that were equally consistent with innocence as well as guilt and that were insufficient as a matter of law to establish first-degree murder. To the extent that these claims are preserved, we conclude they are without merit.

It is well settled in Rhode Island that there is no difference in the probative value of direct evidence and circumstantial evidence. *State v. Simpson,* 611 A.2d 1390 (R.I.1992); *State v. Caruolo,* 524 A.2d 575 (R.I.1987). In *State v. Diaz,* 654 A.2d 1195, 1202 (R.I.1995), this Court held that "[t]he state may prove guilt by a process of logical deduction, by reasoning from an established circumstantial fact through a series of inferences to an ultimate conclusion of guilt." In this jurisdiction the state may rest its case entirely on circumstantial proof, and is no longer required to demonstrate that the circumstantial evidence offered at trial is not only consistent with guilt but inconsistent with any reasonable hypothesis of innocence. *Caruolo,* 524 A.2d at 581; *State v. Jefferson,* 116 R.I.

**932**

124, 129 n. 1, 353 A.2d 190, 194 n. 1 (1976). In attempting to establish defendant's guilt beyond a reasonable doubt, the state may rely entirely upon circumstantial evidence, as long as the totality of the circumstantial evidence presented to the finder of fact constitutes proof of guilt beyond a reasonable doubt. *Diaz,* 654 A.2d at 1202. The distinction between first-and second-degree murder is the length of time the defendant has harbored an intent to kill. "[F]irst degree murder 'requires proof of premeditation of more than a momentary duration and proof of deliberation whereas second-degree murder does not.'" *State v. Brown,* 744 A.2d 831, 838 (R.I.2000) (quoting *State v. Grabowski,* 644 A.2d 1282, 1285 (R.I.1994)). Accordingly we have held that "[i]f that premeditation is more than momentary, the murder is in the first degree and no charge on second degree murder is necessary; if it could be less, then the offense may be murder in either the first or second degree, and a charge on both must be given." *Brown,* 744 A.2d at 838–39 (quoting *State v. Campbell,* 691 A.2d 564, 572 (R.I.1997)).

■ In addition to arguing that the evidence was insufficient as a matter of law to support a conviction, defendant's challenge rests on the element of premeditation necessary to support a charge of first-degree murder. Specifically, defendant contends that the state could not prove the critical element of an intent to kill lasting for more than a momentary duration solely on the fact that the victim suffered multiple blows to the head coupled with the presence of dishwashing gloves found next to the body. We are satisfied, however that there was additional evidence introduced at trial relative to the issue of premeditation. Further, the fact that the state's case was based largely on circumstantial evidence was recognized by the trial justice, who also acknowledged that a great majority of that evidence depended on the jury's assessment of the credibility of the witnesses.

■ In considering a motion for judgment of acquittal, a trial justice and this Court must view the evidence in the light most favorable to the state, without weighing the evidence or assessing the credibility of the witnesses, giving full credibility to the state's witnesses and drawing therefrom every reasonable inference consistent with guilt. *State v. Mercado,* 635 A.2d 260, 263 (R.I.1993); *State v. Laperche,* 617 A.2d 1371, 1373 (R.I.1992). If, after the evidence is considered, the inferences drawn would justify a reasonable juror in finding a defendant guilty beyond a reasonable doubt, the motion for judgment of acquittal must be denied. *Laperche,* 617 A.2d at 1373; *State v. Grundy,* 582 A.2d 1166, 1170 (R.I.1990); *Caruolo,* 524 A.2d at 581–82.

The evidence presented by the state demonstrated that in addition to a heinous attack with multiple blows by a heavy object and the discovery at the scene of gloves that had obviously been removed after the murder, the medical examiner testified that before the fatal blows were inflicted the victim was rendered unconscious by strangulation. This evidence, when considered in light of the other evidence produced at trial, is clearly sufficient on the issue of the duration of an intent to kill. Indeed, when arguing against the inclusion of second-degree murder in the jury charge, defendant's trial counsel agreed that the evidence supported a charge of first-degree murder and only first-degree murder:

> "I suggest the only reasonable inference in this case is that she confronted the invader, if you will, the assailant. The assailant rendered her unconscious, and while helpless on the floor the assailant went put on gloves, went over to the extinguisher, took the extinguisher and finished the task. All very supporting [of a charge of] first degree murder and not one of second degree based upon mere momentary premeditation."

We agree with this assertion and conclude that ample evidence existed on the requisite element of premeditation.

■ The defendant next argued that the trial judge erred by failing to reduce the charge to second-degree murder. On appeal defendant argued that the trial justice should have granted a judgment of acquittal on first-degree murder. However, the record discloses that defendant failed to preserve this issue on appeal. The defendant's argument in favor of a judgment of acquittal centered not on the degrees of murder but rather on the defense that Hornoff was wholly innocent of this crime and that no evidence existed that connected defendant to the crime charged. The defendant agreed that whoever killed this woman did so in such a brutal fashion as to foresee the nature and consequences of his conduct, yet continued to insist that he was innocent and that the state had failed to prove that he was the perpetrator. At the close of evidence, trial counsel renewed his motion for a judgment of acquittal, again suggesting that this was a case of first-degree murder and nothing else. Specifically counsel said:

"If the Court please, the defense would *object* to a charge on second degree murder, and submit that this is a case— based upon the evidence—*that is either first degree murder or nothing.* And when I suggest the first degree murder I personally feel that whoever committed the crime is guilty of first degree murder * * *. The act of going into the kitchen and putting gloves on one at a time, coming back and retrieving the extinguisher and completing the crime of killing this woman creates a time frame which exceeds mere momentary premeditation and, therefore, takes it out of the second degree possibility." (Emphasis added.)

Accordingly, we are satisfied that the evidence presented at trial amply supported the jury's finding that defendant committed this heinous murder and he did so with the specific intent to kill, lasting for sufficient duration, thus satisfying each element of the crime of murder in the first degree.

## Motions for a New Trial

■ The defendant argued two separate motions for a new trial. The first motion was grounded on defendant's contention that evidence was not sufficient to support the verdict; the second was based on what defendant characterized as newly discovered evidence. The law governing motions for a new trial is well settled. The trial justice must determine "whether the evidence adduced at trial is sufficient for the jury to conclude guilt beyond a reasonable doubt." *State v. Scurry,* 636 A.2d 719, 725 (R.I.1994) (citing *State v. McGranahan,* 415 A.2d 1298, 1302 (R.I. 1980)). A trial justice's ruling on a new trial motion is entitled to great weight, *State v. Dame,* 560 A.2d 330, 332–33 (R.I. 1989) (citing *State v.. Henshaw,* 557 A.2d 1204, 1207–08 (R.I.1989)), and will not be disturbed on appeal, provided that he or she has "articulated an adequate rationale for denying [the] motion." *State v. Bleau,* 668 A.2d 642, 646 (R.I.1995). In so doing, the trial justice must pass upon the weight and credibility of the evidence and accept or reject conflicting testimony and, in the exercise of his or her independent judgment, consider all of the material evidence in light of his or her charge to the jury, passing upon the credibility of the witnesses. When reviewing a motion for a new trial this Court applies a deferential standard and will not disturb a trial justice's decision, unless he or she has overlooked or misconceived relevant evidence or was otherwise clearly wrong. *State v. Binns,* 732 A.2d 114, 117 (R.I.1999); *State v. Firth,* 708 A.2d 526, 532 (R.I.1998); and *State v. Gomes,* 690 A.2d 310, 321 (R.I. 1997).

On appeal, the defendant argued that the trial justice erred in refusing to grant a new trial based upon the insufficiency of the evidence. Specifically, he argued that his conviction rested wholly upon infer-

ences drawn from circumstantial proof that was ambiguous and incapable of establishing premeditation by proof beyond a reasonable doubt. In a lengthy written decision, the trial justice analyzed the evidence and concluded that, as the daily front-row observer at the trial, not only was it possible for a reasonable jury to conclude that Hornoff was guilty of first-degree murder, but that the evidence "was presented so convincingly and with such compelling force as to leave no doubt here that Jeffrey Scott Hornoff was properly and deservedly convicted of first degree murder ."

 Appellate counsel maintained that the trial evidence was insufficient to sustain a conviction of first-degree murder, specifically that a reasonable jury could not have found the element of premeditation lasting for sufficient duration. We note that defendant's brief acknowledged trial counsel's argument, apparently for strategic reasons, against inclusion of an instruction on second-degree murder. Whether counsel's reasons were strategic or otherwise is of no consequence to this appeal. What is of consequence however, is the fact that the issue of first-degree versus second-degree murder was never brought to the attention of the trial justice. Defense counsel himself explained to the court that the *only* reasonable inferences in this case support a charge of first-degree murder. In arguing for a new trial, counsel stated, "Your honor, it has always been my position and continues to be my position that what was committed here was first degree murder," insisting however, that no evidence connected defendant to the crime. Accordingly we conclude that this issue has not been properly preserved for appellate review.

 The defendant next challenged the denial of his motion for a new trial based upon newly discovered evidence. To succeed on a motion for a new trial based on newly discovered evidence a defendant must satisfy a two-pronged test. *Binns*, 732 A.2d at 118 (citing *Firth*, 708 A.2d at

532). The first prong consists of several components: the evidence must be newly discovered since trial and not discoverable before trial with the exercise of due diligence. It must not amount to mere cumulative or impeaching evidence, but must be material to the issue upon which it is offered, and of the type which would probably change the verdict at trial. *Firth*, 708 A.2d at 532. Once this first prong has been satisfied, the hearing justice must then "determine if the evidence presented is 'credible enough to warrant a new trial.'" *Id.* (quoting *Gomes*, 690 A.2d at 321).

 The defendant failed to produce any live testimony in support of a new trial, but argued that evidence existed that implicates someone other than defendant in the murder of Victoria Cushman. The defendant has alleged that Craig Price (Price), a notorious inmate at the Adult Correctional Institutions (ACI), bragged to another inmate, Ronald Chase (Chase), that he actually committed this murder. A hearing on the motion for a new trial was scheduled for October 19, 1999, but Chase had been released from the ACI and defendant was unable to produce him. After a one-week continuance, Chase had not yet been located. When the hearing reconvened on October 26, 1999, defendant requested a second continuance.

Instead, the trial justice reviewed the pleadings, as well as the transcript of the defendant's interview of Ronald Chase and found that this evidence was not sufficiently credible to warrant a new trial. The details allegedly given to Chase by Price are in direct conflict with the established facts of the murder. For example, Price claimed to have committed the murder in a home in a wooded area. He bragged about brutally penetrating her sexually in such a fashion that would certainly be discovered during an autopsy. He also claimed to have kicked the victim in the face, that he tore up her house before leaving, and that as he left he heard the

sound of dogs barking: None of these assertions even remotely resembled the evidence collected at the scene of this grisly homicide. The autopsy revealed no evidence of sexual assault whatsoever. The apartment where Victoria was killed was located in a developed industrial park, far from any wooded area. The testimony was clear that the apartment was not ransacked and that the only items out of place were the fire extinguisher, the dishwashing gloves and the overturned plant. Finally, the bruises on the victim's face and head were consistent with blows from the fire extinguisher, with no suggestion that the victim had been kicked or otherwise battered. The story allegedly told by Price through Chase is not only improbable but incredible. Again, the burden is on the defendant to produce newly discovered and *credible* evidence. Here, the trial justice reviewed the pleadings and the Chase interviews and determined that the evidence was insufficient to warrant a new trial. Therefore, no purpose would have been served by an evidentiary hearing, considering that the witness could not be located and the evidence he would purportedly offer failed to meet the most basic criteria necessary to warrant a new trial.

### Trial Justice's Remarks

The defendant next asserts that remarks made by the trial justice to the jury were prejudicial and constituted reversible error. The defendant contends that the trial justice improperly commented on the testimony when, after the lengthy and difficult testimony of David Hornoff, the trial justice inquired if the jurors had had enough for the day and wanted to recess. In response to their affirmative answer the trial justice stated "[p]robably the first direct answer I have had all day." No objection was made to this comment, nor was this issue brought to the attention of the trial justice at any time.

When a criminal defendant's claim of error rests on allegedly prejudicial remarks made by the trial justice, this Court weighs the potential prejudicial impact that any such comments may have had on the trial jury. *State v. Austin*, 742 A.2d 1187, 1192 (R.I.1999) (citing *State v. Figueroa*, 673 A.2d 1084, 1090 (R.I.1996)). However, in accordance with our well settled raise or waive rule, issues that were not preserved by a specific objection at trial, " 'sufficiently focused so as to call the trial justice's attention to the basis for said objection, may not be considered on appeal.' " *Austin*, 742 A.2d at 1192 (quoting *State v. Bettencourt*, 723 A.2d 1101, 1107 (R.I.1999)). Therefore, " 'allegations of error committed at trial are considered waived if they were not effectively raised at trial, despite their articulation at the appellate level.' " *Id.*

However, were we to reach this issue, we are satisfied that the defendant's right to a fair trial was not prejudiced in any way by this seemingly inappropriate remark made by the trial justice at the end of a long day. Our careful review of the trial record indicates that the trial justice conducted himself, throughout the trial, in a commendably fair and impartial manner. It is clear that the comment made by the trial justice, although unfortunate, does not amount to improper commentary on the testimony of a particular witness. In addition, in his charge to the jury the trial justice made it clear that any remarks made by him during the course of the trial should not be construed as evidence or an indication of any opinion he may have about the facts or the testimony. He did, however, explain to the jury that his feelings, if he had them, were completely irrelevant and that it was the jury's function, and theirs alone, to make factual determinations and assess the credibility of the witnesses. Based on the foregoing analysis, we conclude that the trial justice at all times during the trial, maintained the requisite judicial impartiality, and that the defendant's claim of error is without merit.

### Conclusion

For the foregoing reasons, the defendant's appeal is denied and dismissed and the judgment of conviction is affirmed. The papers in this case are remanded to the Superior Court.