[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
On December 18, 1995, John Carpenter was shot to death in broad daylight on the streets of South Providence. Petitioner Jason Ferrell was indicted along with four (4) other men for Mr. Carpenter's murder and related crimes. At trial, Mr. Ferrell was acquitted of murder, but convicted of conspiracy to murder Carpenter as well as conspiracy to assault and assault with intent to murder one Lorenzo Evans. The petitioner received consecutive sentences and currently is serving an aggregate of forty (40) years at the Adult Correctional Institutions. In a post-conviction relief application brought pursuant to R.I.G.L. 10-9.1-1, et seq., he asserts that newly discovered evidence and the ineffectiveness of his attorney warrant a new trial.[1]
On December 18, 1995, Lorenzo Evans was a passenger in an automobile operated by John Carpenter. When three (3) men other than Petitioner Ferrell opened fire from their black Jeep on Carpenter and Evans, Evans managed to exit the vehicle and flee through nearby backyards and streets. It was at a separate location from where Carpenter was murdered outside his vehicle that Lorenzo Evans testified at the trial that he saw Jason Ferrell in a white Ford Taurus with another black male, Germaine Campbell. Evans also testified that he saw Ferrell brandish a pistol, though he did not fire it. The testimony of Lorenzo Evans was the only evidence that placed Ferrell or his passenger, Germaine Campbell (who was convicted on the two conspiracy counts), in the general vicinity of John Carpenter's untimely end.
Petitioner Ferrell has placed before this Court a videotape and an accompanying transcript evidencing the recanting by Mr. Evans of his trial testimony. On the tape, Evans declares that he did not see Mr. Ferrell or Mr. Campbell in a white Taurus at or near the scene of John Carpenter's murder — or anywhere else for that matter — on December 18, 1995. A recanting can constitute a basis for the granting of postconviction relief pursuant to R.I.G.L. 10-9.1-1 (a) (4) as it is "evidence of material facts, not previously presented and heard, that requires vacation of the conviction or sentence in the interest of justice . . ." Because I find the recanting of Mr. Evans to be credible when considered within the totality of the circumstances, Jason Ferrell's petition for postconviction relief is granted, his convictions are vacated and his sentences set aside.
Other than the testimony of Lorenzo Evans, there was no evidence whatsoever that tended to prove any element of any of the crimes for which Mr. Ferrell stands convicted. No other witness placed him near the scene of the shooting or in the locale where the events immediately preceding and following the shooting are claimed by Evans to have taken place. Ferrell never admitted to the police or to any other person that he engaged in any of the conduct attributed to him. Thus, the jury heard from no other eye witnesses, nor did it hear from any prison guards or cell mates about a "jailhouse admission." Moreover, no tangible evidence of any kind connects the petitioner with any criminal activity directed against John Carpenter or Lorenzo Evans. No pistol was ever introduced as evidence against him, nor was any forensic evidence submitted for the jury's consideration. In short, without Lorenzo Evans, there is no case against Jason Ferrell.
At petitioner's evidentiary hearing, Lorenzo Evans was called as a witness, but on the advice of his attorney invoked his Fifth Amendment privilege on every question put to him, whether by Petitioner's attorney, the Attorney General, or the Court. Gerard Donnelly Esq., Mr. Evan's attorney, indicated that Evans was asserting his privilege because of several potential criminal charges unrelated to the instant matter as well as his concern about a perjury charge or charges arising out of his recanting. Needless to say, Mr. Donnelly was not at liberty to develop this point or to indicate which of Evans' two versions of the December 18, 1995 events is true. The Court offered the Attorney General an opportunity to go before the Presiding Justice, pursuant to R.I.G.L. 12-17-15, to seek immunity for Mr. Evans so that his recanting could be explored more fully during the hearing, but this offer was declined.
The State's theory regarding the murder of John Carpenter is that the conspirators killed him to avenge the murder of their friend, Wayne Baptista, three (3) days prior to Carpenter's death. This, along with other evidence put before the juries simultaneously trying the indictments arising out of the Carpenter murder, constituted evidence sufficient to sustain the convictions that resulted, and so said our Supreme Court. State v. Gahil Oliveira, et al., 774 A.2d 893 (2001). But so far as petitioner Ferrell's convictions are concerned, without Evans' testimony, the State's case collapses.
Regarding Ferrell's post-conviction relief application, the State advances a theory about a separate and distinct unlawful conspiracy. The Attorney General argues that Lorenzo Evans, who went on trial for the murder of Wayne Baptista after Ferrell had already been convicted, entered into a criminal agreement to recant his testimony against Jason Ferrell if the key witness to the Baptista murder, one Santos, refused to testify against him. During the so-called communication, it must be emphasized that the State asserts that no spoken or written language was used, but rather hand gestures purportedly signaled a meeting of the minds; yet no credible evidence was put forward at the petition hearing indicating what the signs and signals meant. Of course, even had such evidence been forthcoming, there is not a jot of evidence connecting Ferrell to any such exchange.
The record from Evans' trial indicates that Santos was shaky in recounting events surrounding Baptista's slaying; and his inability to identify Lorenzo Evans as the killer lead to Evans' acquittal. But this theory of Ferrell's participation in such a nefarious scheme is not supported by any credible evidence. Not a scintilla of evidence was placed before the Court indicating that Jason Ferrell was involved in or privy to such an agreement or even that he had knowledge of such a scheme; he was definitely not present at the so-called "hand gesture" exchange. Moreover, the State did not produce any evidence that Lorenzo Evans himself had subverted his own trial:
 THE COURT: You didn't answer my question. Did he [Lorenzo Evans] or did he not participate in the subversion of his own trial, State versus Lorenzo Evans?
 MR. DALY: I do not have a kernel of evidence that he did that. I have no evidence of that. There is none out there. There is none in existence to say that he did. . . . (January 9, 2004 — Tr. 18)
 Analysis A. The Recantation
The Supreme Court of Rhode Island has provided guidance relative to the role of a trial judge considering petitions such as Mr. Ferrell's:
 In analyzing a post-conviction relief application based on newly discovered evidence, we apply the standard used for awarding a new trial based on newly discovered evidence. [citations omitted]. Bleau v. Wall, 808 A.2d 637, 642 (R.I. 2002)
The standard consists of a two-part test.
 `The first part is a four-prong inquiry that requires that the evidence be (1) newly discovered since trial, (2) not discoverable prior to trial with the exercise of due diligence, (3) not merely cumulative or impeaching but rather material to the issue upon which it is admissible, [and] (4) of the type that would probably change the verdict at trial.' [citations omitted]
 For the second part of the inquiry, the hearing justice must exercise his or her discretion and determine whether the newly discovered evidence is credible enough to warrant relief. [citations omitted]
 Bleau v. Wall, 808 A.2d 637, 642 (2002).
No one disputes that the version of events described in Mr. Evans' recanting is newly discovered and was surely unavailable before trial, no matter how diligent the efforts of trial counsel or any investigators. And the recanting is "not merely . . . impeaching but rather material to the issue upon which it is admissible . . ." In his recanting, Lorenzo Evans states categorically that neither Jason Ferrell nor Germaine Campbell had any connection with the shooting of John Carpenter or any threats or assaults directed at him (Evans), but he persisted in his assertion that the three (3) individuals in the black Jeep were who he said they were and did what he testified they did. Moreover, his recanting clearly fits the definition of relevant evidence as it has the "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, R.I. Rules of Evid.
New testimony by Lorenzo Evans that Jason Ferrell was not at the scene of the criminal activity of December 18, 1995 would undoubtedly — or at the very least, probably — result in acquittals for Mr. Ferrell. This is so because the only evidence produced by the State connecting Jason Ferrell to the criminal activity directed at John Carpenter and Lorenzo Evans on that date was the identification testimony of Lorenzo Evans. Though the State was able to show that Jason Ferrell was a friend of Wayne Baptista, the man murdered on December 15, and was upset by his friend's death, no evidence other than Evans' pointed finger linked him to the crimes for which he was convicted. There were no admissions or confessions, fingerprints, DNA comparisons, no forensic evidence of any type, no gun seized — in short, nothing.
The recanting of Lorenzo Evans was memorialized on a videotape made under the supervision of Matthew Smith, Esq., a member of the Bar in good standing. Mr. Smith testified at the post-conviction relief application hearing and described the circumstances surrounding the making of the tape as well as his observations about the behavior and demeanor of Lorenzo Evans. Mr. Smith, who at the time of the videotaping had recently left the employ of the Attorney General's Office where he served as a prosecutor, indicated that there were no facts or circumstances of which he was aware that would lead to any conclusion that Evans was under the influence of any drugs or alcohol or was being forced, cajoled or promised benefits to give his recanting testimony. I find that Mr. Smith, who indicated he also has duties as a Lieutenant Colonel in the Army Reserve, to be a credible witness. For its part, the State did not contest the authenticity of the tape nor did it produce any evidence whatsoever that Mr. Evans had been improperly induced to give his statement to Mr. Ferrell's attorneys.
The tape itself clearly depicts Mr. Evans, who was in court when it was shown on the video monitor. On the tape, he answers questions in a straightforward manner and does not appear to be under the influence of any drugs or alcohol or otherwise inattentive or unaware of what was transpiring. As noted above, while this tape impeaches Mr. Evans' trial testimony, it is not "merely impeaching" but is "material to the issue upon which it is admissible." Bleau v. Wall, supra at 642. Moreover, the tape, in addition to fitting under the rubrics of "impeaching" and "material," would also be considered substantive evidence under Rule 801 of the Rhode Island Rules of Evidence.
The Supreme Court has directed that trial judges must give "a full and comprehensive consideration [to] the proposed recanted testimony . . ." and then determine whether "on the totality of the circumstances a new trial is or is not warranted . . ." State v. Fontaine [I] 559 A.2d 622,625 (1989). Regarding Jason Ferrell's petition, what are the factors gleaned from the totality of circumstances that support the determination that the recanting is credible? The demeanor of Mr. Evans on the videotape, the testimony of Matthew Smith, Esq. regarding the provenance of the tape, and the State's inability to produce even a scintilla of evidence that Mr. Ferrell did anything untoward to bring about Mr. Evans' recanting have already been noted, as has the dearth of any evidence, testimonial or otherwise, linking Jason Ferrell to the crimes for which he stands convicted. Just as important are the credibility questions surrounding the testimony Lorenzo Evans gave at the trial of Jason Ferrell and the other four (4) men, some of which were noted by our Supreme Court in State v. Oliveira, supra.
For example — and significantly — minutes after the shooting of John Carpenter, Evans was taken into police custody, but "[w]hile at the police station, Evans made a statement to the police in which he said that he could not identify any of the shooters. . . ." 774 A.2d, at 901. On the following day Evans returned to the police station and identified the three (3) men who shot at him and Carpenter, and "also told the police that he saw Ferrell and Campbell in the Taurus." 774 A.2d at 901-902. Our Supreme Court also noted that the record disclosed a change in testimony by Evans at his trial from earlier statements he made at the bail hearing and the grand jury regarding his vantage point of the crime scene where Carpenter was killed:
 It was clear from the photographs taken by the Providence Police and by defendants that, from that angle, the crime scene could not be seen and that Evans never could have seen any of the defendants to make any kind of identification. However, at trial, Evans changed his previous testimony and asserted that he had been caught on a picket fence not thirty feet from the murder scene, in the same yard and driveway as the murder scene, with a clear view and no obstructions. This vantage point was some seventy feet closer to where the murder had occurred than the one previously described by Evans at the bail hearing and in his grand jury testimony. 774 A.2d, at 901(n 3).
Additionally, the Supreme Court noted that the testimony of the medical examiner undercut Evans' assertion that he had eaten breakfast with John Carpenter earlier on the morning of the killing: "Dr. Laposata's testimony was in direct conflict with Evans' testimony that he and Carpenter had eaten breakfast at John's restaurant the morning of the murder," 774 A.2d, 902 (n 5).
Obviously, in considering the appeal of Jason Ferrell and the others convicted for the December 18th crimes, the Supreme Court deemed the evidence placed before the jury, who necessarily functioned as the fact finders and evaluators of credibility, to be sufficient. The jurors of course did not have before them the videotaped statement of Lorenzo Evans declaring that the three (3) shooters — Sanders, Oliveira, and McKinney were indeed at the scene in their black Jeep, but that Jason Ferrell and Germaine Campbell were not there — not in a white Taurus nor in any other vehicle. The jury was apparently willing to overlook the discrepancies and contradictions noted by the Supreme Court regarding distances, the breakfast, and a declaration to the police by Evans during his first encounter with them that he could not identify the assailants. A reasonable jury, with the recantation now placed into the mix and with no other corroborating evidence before it, would probably acquit Jason Ferrell of the crimes for which he stands convicted.
There is additional evidence that corroborates Mr. Evans' declaration that Jason Ferrell was not involved in or even present at the shooting of John Carpenter and any assault on Lorenzo Evans. Germaine Campbell testified that neither he nor Jason Ferrell were present at the scene, and despite vigorous efforts by the Assistant Attorney General to shake his denial, he did not deviate from his direct testimony. A man lacking in sophistication or education, when asked by Mr. Daly to state the purpose of the postconviction proceedings, Campbell answered spontaneously and without guile, "the truth coming out, finally coming out." (January 6, 2004 — Tr. 33) Despite a domestic violence conviction and problems with a suspended license, which was fully explored on crossexamination, I find that Mr. Campbell was a credible witness. It will be remembered that Mr. Campbell did not pursue an appeal from his conviction. To anyone familiar with criminal law, the reason is apparent. Mr. Campbell received a relatively light sentence — eighteen (18) months to serve — and upon receiving that sentence was immediately discharged from custody, having received credit for time already served.
The State points to Lorenzo Evans' invoking his Fifth Amendment privilege at Ferrell's post-conviction hearing and cites a standard treatise on federal practice for the proposition that "[i]f the recanting witness claims his privilege against self-incrimination when he is put on the stand at the hearing on the motion for a new trial, the motion will be denied . . ." Wright, King Klein, Federal Practice and Procedure: Criminal 3d § 557.1, at 578-79 (3rd Ed. 2004). The treatise itself, though published in 2004, references only two cases that support this proposition (n. 18, "claim of privilege" p. 583), and the Attorney General references several others on this point. This is hardly the stuff of an immutable legal principle. More important, there is no such controlling case in Rhode Island, nor should there be.
At the post-conviction hearing, the State was offered a short continuance and an opportunity to obtain a grant of immunity for Mr. Evans:
 THE COURT: Mr. Daly, at the conclusion of yesterday's proceedings, I inquired of you about the State seeking an immunity grant for Lorenzo Evans, and you said you needed a little bit of time to reflect on that. Have you determined what the State is going to do?
 MR. DALY: Your Honor, at this juncture we are not going to offer Mr. Evans immunity to testify in these proceedings (January 6, 2004 — Tr. 1).
Petitioner Ferrell's claim should not fail because the State makes a strategic determination not to seek immunity for Mr. Evans, especially as the controlling law provides no opportunity for anyone other than the Attorney General to seek and obtain a grant of immunity for a witness asserting his Fifth Amendment privilege. R.I.G.L. 12-17-15. This is especially true when there exists an independent piece of evidence in the form of a videotape memorializing Evans' recantation. Petitioner Ferrell's fate should not be shackled to the vacillating proclivities of Lorenzo Evans to speak anymore than he should languish in prison because of Evans' mendacity. As to who should bear the burden of Evans's behavior, a century-old case from the Supreme Court of Arkansas provides a helpful analysis.
In Bussey v. State, 64 S.W. 268 (1901), after conviction for a rape and a sentence of death, the petitioner submitted an affidavit by the complaining witness retracting her accusation. 64 S.W. at 268. The analysis of the Arkansas Supreme Court puts into perspective the Fifth Amendment issue as well as any concern that the allowing of recanted testimony to overturn convictions would lead to a landslide of such claims:
 If it be said that to permit a witness, by a confession of perjury, to overturn a judgment based on her testimony would license her to trifle with the courts, we must reply that such a witness undoubtedly deserves to be punished; but this furnishes no reason for the refusal of justice to the defendant. It is the witness, and not the defendant that has trifled with the court, and she, and not the defendant should suffer for such contempt. The court and jury, relying on the testimony of this witness as that of a truthful and trustworthy woman, have convicted the defendant, and sentenced him to be hanged; but, if her affidavit is true, her testimony is false, and the judgment wrong. The circumstances under which she made this written retraction of her former testimony are such as to raise the belief that the retraction, and not the testimony is true and that, if this judgment is enforced, the defendant will suffer death for a crime of which he is not guilty. But whatever the truth may be, whether the defendant be guilty or innocent, it can be established by another trial; and certainly it is better that this case be retried than to enforce a judgment for the extreme penalty of death, when the newly — discovered evidence that could not be produced at the trial makes it seem probable that this judgment was wrong.[2]
64 S.W. at 269.
As in Bussey v. State, the testimony here of the only witness was shaky and impeached at the original trial, although it was believed. Now, with the recanting — just as in Bussey v. State — the testimony at the trial must be deemed incredible and unworthy of belief. Credibility, after all, is not synonymous with truthfulness; a witness may be credible, but greatly mistaken, or even perjurious.
The Wright Treatise relied on by the State surprisingly ignores the findings of recent exonerations studies, for they have much to teach us about perjury and its often tragic consequences. On April 19, 2004, Professor Samuel R. Gross of the University of Michigan Law School and his team of researchers released a study titled "Exonerations in the United States, 1989 through 2003,"[3] which collated data of 328 exonerations across the United States during that period of time, "145 of them [having been] cleared by DNA, 183 by other sorts of evidence." (Jeffrey Hornoff, Rhode Island's most famous exoneree, was one of the cases studied by the Michigan researchers. His case (prior to his exoneration) is chronicled in State v. Hornoff, 760 A.2d 927 (R.I. 2000)). Professor Gross and his colleagues carefully studied the exoneration cases to determine the causes for these convictions of actually innocent people. There findings were disturbing on many levels, including what was learned about the disproportionate amount of people of color victimized by these miscarriages of justice. But what is of particular importance for this petition is the background data they supply relative to perjury. The Gross study determined that after misidentification, perjury was the greatest cause of wrongful convictions: "In at least "58 of the 328 exonerations the defendant wasfalsely accused at trial by someone who claimed to have witnessed thecrime: a supposed victim, participant, or eye witness. . . ." (p. 18). (Emphasis supplied). As the study pointed out, not all perjury is that of an eye witness, but perjury is endemic: "overall, in 44% of all exonerations (145/328) at least one sort of perjury is reported — including 57% of murder exonerations (114/199), and 24% of rape exonerations (29/120)." (p. 18)
A case that mirrors petitioner Ferrell's is that of State ex rel Amrinev. Roper decided by the Supreme Court of Missouri en banc on April 29, 2003. 102 S.W. 3d 541 (Mo. banc 2003). Amrine pursued a lengthy and tortuous trail of appeals and habeas corpus applications in state and federal courts from his in-prison murder conviction arising out of an October 18, 1985 incident at the Jefferson City Correctional Center.102 S.W. 3d at 545; but what is instructive for the instant matter is the assessment of the Missouri Supreme Court. In his last — and ultimately successful — litigation, Amrine demonstrated that the only three witnesses to his alleged murdering of the other inmate had all recanted, one of them by way of testimony to a trial judge and two by way of videotapes. 102 S.W. 3d at 545. Just as in Ferrell's situation, there was no other evidence of any sort linking Amrine to the murder. Said the Missouri Supreme Court:
 There was no physical evidence linking Amrine to the murder. Instead, Amrine was convicted on the testimony of three fellow inmates, each of whom have now completely recanted their trial testimony.
 This case thus presents the rare circumstance in which no credible evidence remains from the first trial to support the conviction. . . . . 102 S.W. 3d at 548.
The Missouri Supreme Court was skeptical as to whether Amrine could be successfully tried again, but left that option to the State as there was no double jeopardy bar to a retrial. 102 S.W. 3d at 541. The Court indicated that the State could pursue the matter "if [it] believes it can produce enough evidence, based on such evidence as it may have, even recanted evidence, to once again bring this case to a jury."102 S.W. 3d at 549. Just as in the Amrine case, here the recanting of the only evidence against Ferrell, combined with the lack of any other evidence linking him to the crimes, compels the granting of Ferrell's petition.
See also State v. Macon, 911 P.2d 1004 (Wash. banc 1996), where the Supreme Court of Washington announced the controlling doctrine for that jurisdiction when the only evidence on which a conviction rests is testimony now credibly recanted: ". . . when a defendant's conviction is based solely upon the testimony of a recanting witness, and the trial court determines the recantation is reliable, the trial court must grant the defendant's motion for a new trial." 911 P.2d, at 1014 (Emphasis in original).
The Supreme Court of Rhode Island has instructed that in circumstances such as those presented in this hearing "the fact finder must weigh the evidence and must use its experience with people and events in weighing the probabilities." State v. Collazo, 446 A.2d 1006, 1011-12 n. 4 (R.I. 1982)". The instant petition presents facts that raise questions about the reliability of the conviction: the recanted testimony of a man with a background of involvement in criminal activity whose testimony at the original trial was marked by self-contradiction on key points and whose version of the events of December 18, 1995 relative to Jason Ferrell has never been corroborated by other evidence. This problem must be placed against the backdrop of the developing experience of the criminal justice system, which as Gross and others have pointed out, is not infallible and can, even with the best of intentions, incarcerate actually innocent people.
When a trial judge evaluates credibility and weighs evidence on a motion for a new trial or a petition for post-conviction relief, he or she does not operate in a vacuum but is obliged to place factual assessments against the controlling burden of proof as defined by the substantive law. Regarding criminal trials, the controlling burden is, of course, proof beyond a reasonable doubt, which has been defined by the Rhode Island Supreme Court: "[P]roof `beyond a reasonable doubt' means the facts asserted by the prosecution are almost certainly true . . ."Parker v. Parker, 103 R.I. 435, 442 (1968). No reasonable jury confronted with the recantation of Lorenzo Evans, combined with the impeaching factors noted by our Supreme Court and the absence of any other evidence connecting Jason Ferrell to criminal activity on December 18, 1995, would convict him, because no reasonable jury could say, given the present state of the record, that the State's accusations are "almost certainly true."
B. Ineffective Counsel Claims
Petitioner Ferrell advances two other claims for relief, both of which are based on his assertion that his prior counsel was ineffective. One claim focuses on his trial attorney's failure to comply with the mandate of Rule 16 (c) regarding the obligation of the defendant to provide "with specificity" the place and time that his alibi witnesses will assign his whereabouts; as a result of his attorney's failure to fully disclose this information relative to one Debra Baptista, an alibi witness, the trial justice excluded that portion of the information which was not turned over to the State prior to trial. On appeal, the issue was raised by Mr. Ferrell, but in State v. Oliveira, supra, at 908, the Rhode Island Supreme Court found that the trial justice followed the rule appropriately and did not abuse her discretion in barring the admission of a portion of Ms. Baptista's testimony. Ferrell also claims that his trial attorney negligently failed to assert a double jeopardy claim that he should have been tried for only one — not two — conspiracies. Petitioner Ferrell's Rule 16 claim has merit, but his double jeopardy assertions do not.
There is no dispute but that Debra Baptista was barred — properly so — from testifying that Jason Ferrell was in her presence a second time on the morning of the murder, specifically after 11:15 a.m. and up to "approximately 11:35 a.m." 774 A.2d at 908. We know that the medical examiner put the time of Mr. Carpenter's death at 11:27 a.m. ("she testified that Carpenter died at 11:27 a.m. of multiple gunshot wounds to his head and body, three of them fatal . . ." 774 A.2d at 902." We also know that the trial judge found the failure of defense counsel to comply with the clear strictures of Rule 16 to be a breach that unfairly surprised the State in the middle of the trial, hence warranting her sanction of exclusion. Even without the testimony of defense counsel, Joseph Bevilacqua, the record discloses this obvious failure to comply with the clear mandate of a rule of pre-trial practice. In this matter, however, the defense attorney testified and admitted his negligence. The non-compliance with an unambiguous rule is clearly negligence on the part of defense counsel; his conduct was well outside that expected of criminal defense practitioners, even those with limited experience. It rises to the level of ineffectiveness because of the crucial import of Ms. Baptista's testimony. While other alibi witnesses for Mr. Ferrell could place him within another section of the city near the time of the South Providence shooting, Ms. Baptista's excluded testimony has him physically in her presence on the East Side when Mr. Carpenter was shot on the other side of the city.
The ineffective counsel claim grounded on non-compliance with Rule 16 was presented at the post-conviction hearing along with the newly discovered evidence claim of a recanting. Viewed together, as these claims must be, given the requirement of a totality-of-the — circumstances analysis, these two pieces of evidence, had they been placed before the fact finders, would undoubtedly have lead to a different result. I hasten to add Ferrell would be entitled to post-conviction relief if all he had was the recanting; but the Rule 16 ineffectiveness claim buttresses his position. If all he had, however, was the Rule 16 claim, his claim might be weaker, and a more thorough analysis of all dimensions of his alibi defense would have been undertaken.
As to the double jeopardy claim, if appears that this was given thought by Ferrell's counsel, and it cannot be determined that a double jeopardy argument was not rejected as a tactic or strategy. In its opinion on the appeal of Jason Ferrell, our Supreme Court discussed what certainly appears to be a waiver of the double jeopardy defense. 774 A.2d at 920. The Supreme Court noted, in so many words, that Mr. Ferrell and his attorney had several occasions to raise the double jeopardy issue: prior to the trial getting underway, during the trial by requesting the trial justice to exercise her discretion to allow it, at the sentencing or by way of a post-sentence Rule 35 motion. The Supreme Court noted, "according to the court file, Ferrell filed a Super. R. Crim. P. 35 motion on October 21, 1997. That motion was passed three times and, then, ultimately withdrawn." 774 A.2d at 920 (n 26). In any event, given the facts adduced at trial, it appears that a theory of two conspiracies is supported by the evidence: One of the conspiracies had as its object the murder of John Carpenter, and the other conspiracy had as its object the murder — or the doing of serious bodily harm — to Lorenzo Evans. Accordingly, petitioner Ferrell's ineffective counsel claim grounded on the failure of the attorney to raise a double jeopardy defense fails.
 Conclusion
For the foregoing reasons, petitioner Ferrell's application for post-conviction relief is granted. His convictions and his sentences imposed as a result of those convictions are vacated.
[1] I was not the trial justice in this matter. The case came before me pursuant to the Rules of Practice of the Rhode Island Superior Court which provide that when a post-relief application is sought relative to a case where — as here — the trial justice is not longer a member of the Superior Court bench, the petition is to go before the justice presiding over the Formal and Special Cause Calendar. R.P. 2.3 (d). I was the Associate Justice assigned to preside over the Formal and Special Cause Calendar when this petition was presented.
[2] There may be an apprehension, not unlike that addressed by the Supreme Court of Arkansas, that the setting aside of a conviction because of a recantation will lead to a plethora of such claims. Apart from the fact that our system of individualized justice does not countenance the extending or withholding of constitutional or other rights to people based on the probabilities of what would occur in some separate and unrelated cases, the frequency of post-trial recantations to date is minimal. Reported cases of such instances in this jurisdiction are barely a handful. Anecdotally, I can report that during my twenty four (24) years as an attorney with a sizable criminal practice and my more than ten (10) years on the bench, if I have encountered one post-trial recantation other than that of Lorenzo Evans, it is a lot.
[3] Samuel R. Gross et al., Exonerations in the United States, 1989through 2003, available at
http://www.law.umich.edu/newsandinfo/exonerations-in-us.pdf [hereinafter Gross] Professor Gross was certainly not the first to study this issue. See, eg., Barry Scheck et al., Actual Innocence (2000). See also Stanley Cohen, The Wrong Men: America's Epidemic of Wrongful Death Row Convictions (2003); Mark Fuhrman, Death and Justice: An Expose of Oklahoma's Death Row Machine (2003). Erroneous convictions, of course, are nothing new. For an early cataloging and assessment of this problem see, Edwin Borchard, Convicting the Innocent (1932).